# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF IOWA
# CEDAR RAPIDS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, Plaintiff, vs. PATRICK DERONE JAMES, Defendant. | No. 20-CR-49-CJW-MAR<br><br>**ORDER** |

## I. INTRODUCTION

This matter is before the Court on defendant's objections (Doc. 38) to the Report and Recommendation ("R&R") (Doc. 33) of the Honorable Mark A. Roberts, United States Magistrate Judge. On June 1, 2021, defendant filed a Motion to Suppress. (Doc. 23). The government timely resisted. (Doc. 25). On June 16, 2021, Judge Roberts held a hearing on defendant's motion. (Doc. 29). On June 25, 2021, Judge Roberts issued an R&R recommending that the Court deny defendant's Motion to Suppress. (Doc. 33). On July 9, 2021, defendant filed his objections. (Doc. 38).

For the following reasons, the Court **sustains in part and overrules in part** defendant's objections, **adopts** Judge Roberts' R&R (Doc. 33) with minor modifications, and **denies** defendant's Motion to Suppress (Doc. 23).

## II. STANDARD OF REVIEW

The Court reviews Judge Roberts' R&R under the statutory standards found in Title 28, United States Code, Section 636(b)(1):

> A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the

magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

*See also* FED. R. CIV. P. 72(b) (stating identical requirements). While examining these statutory standards, the United States Supreme Court explained:

> Any party that desires plenary consideration by the Article III judge of any issue need only ask. Moreover, while the statute does not require the judge to review an issue de novo if no objections are filed, it does not preclude further review by the district judge, sua sponte or at the request of a party, under a de novo or any other standard.

*Thomas v. Arn*, 474 U.S. 140, 154 (1985). Thus, a district court may review de novo any issue in a magistrate judge's report and recommendation at any time. *Id.* If a party files an objection to the magistrate judge's report and recommendation, the district court must review the objected portions de novo. 28 U.S.C. § 636(b)(1). In the absence of an objection, the district court is not required "to give any more consideration to the magistrate[ judge]'s report than the court considers appropriate." *Thomas*, 474 U.S. at 150.

De novo review is non-deferential and generally allows a reviewing court to make an "independent review" of the entire matter. *Salve Regina Coll. v. Russell*, 499 U.S. 225, 238 (1991); *see also Doe v. Chao*, 540 U.S. 614, 620–19 (2004) (noting de novo review is "distinct from any form of deferential review"). The de novo review of a magistrate judge's report and recommendation, however, only means a district court "'give[s] fresh consideration to those issues to which specific objection has been made.'" *United States v. Raddatz*, 447 U.S. 667, 675 (1980) (quoting H.R. Rep. No. 94–1609, at 3, reprinted in 1976 U.S.C.C.A.N. 6162, 6163 (discussing how certain amendments affect Section 636(b))). Thus, although de novo review generally entails review of an entire matter, in the context of Section 636 a district court's required de novo review is

limited to "de novo determination[s]" of only "those portions" or "specified proposed findings" to which objections have been made. 28 U.S.C. § 636(b)(1).

Consequently, the Eighth Circuit Court of Appeals has indicated de novo review would only be required if objections were "specific enough to trigger de novo review." *Branch v. Martin*, 886 F.2d 1043, 1046 (8th Cir. 1989). Despite this "specificity" requirement to trigger de novo review, the Eighth Circuit Court of Appeals has "emphasized the necessity . . . of retention by the district court of substantial control over the ultimate disposition of matters referred to a magistrate [judge]." *Belk v. Purkett*, 15 F.3d 803, 815 (8th Cir. 1994). As a result, the Eighth Circuit Court of Appeals has concluded that general objections require "full de novo review" if the record is concise. *Id*. Even if the reviewing court must construe objections liberally to require de novo review, it is clear to this Court that there is a distinction between making an objection and making no objection at all. *See Coop. Fin. Ass'n, Inc. v. Garst*, 917 F. Supp. 1356, 1373 (N.D. Iowa 1996).

In the absence of any objection, the Eighth Circuit Court of Appeals has indicated a district court should review a magistrate judge's report and recommendation under a clearly erroneous standard of review. *See Grinder v. Gammon*, 73 F.3d 793, 795 (8th Cir. 1996); *see also Taylor v. Farrier*, 910 F.2d 518, 520 (8th Cir. 1990) (noting the advisory committee's note to Federal Rule of Civil Procedure 72(b) indicates "when no timely objection is filed the court need only satisfy itself that there is no clear error on the face of the record"); *Branch*, 886 F.2d at 1046 (contrasting de novo review with "clearly erroneous standard" of review, and recognizing de novo review was required because objections were filed).

The Court is unaware of any case that has described the clearly erroneous standard of review in the context of a district court's review of a magistrate judge's report and recommendation to which no objection has been filed. In other contexts, however, the

3

Supreme Court has stated the "foremost" principle under this standard of review "is that '[a] finding is "clearly erroneous" when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Anderson v. City of Bessemer City*, 470 U.S. 564, 573–74 (1985) (citation omitted). Thus, the clearly erroneous standard of review is deferential, *see Dixon v. Crete Med. Clinic, P.C.*, 498 F.3d 837, 847 (8th Cir. 2007), but a district court may still reject the magistrate judge's report and recommendation when the district court is "left with a definite and firm conviction that a mistake has been committed," *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948).

Even though some "lesser review" than de novo is not "positively require[d]" by statute, *Thomas*, 474 U.S. at 150, Eighth Circuit precedent leads this Court to believe that a clearly erroneous standard of review should generally be used as the baseline standard to review all findings in a magistrate judge's report and recommendation that are not objected to or when the parties fail to file any timely objections, *see Grinder*, 73 F.3d at 795; *Taylor*, 910 F.2d at 520; *Branch*, 886 F.2d at 1046; *see also* FED. R. CIV. P. 72(b) advisory committee's note ("When no timely objection is filed, the court need only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation."). In the context of the review of a magistrate judge's report and recommendation, the Court believes one further caveat is necessary: a district court always remains free to render its own decision under de novo review, regardless of whether it feels a mistake has been committed. *See Thomas*, 474 U.S. at 153–54. Thus, although a clearly erroneous standard of review is deferential and the minimum standard appropriate in this context, it is not mandatory, and the district court may choose to apply a less deferential standard.

4

## III. FACTUAL BACKGROUND

After reviewing the record, the Court finds that Judge Roberts accurately and thoroughly summarized the relevant facts in his R&R. (Doc. 33, at 3–7). Further, neither party objects to the R&R's factual findings. Thus, the Court adopts and incorporates below the R&R's factual findings without modification. (*Id.*) (original footnotes omitted).

> On March 9, 2020, Officer Emily Machula received a stolen vehicle report from Robin Cooper who personally appeared at the police station. Mr. Cooper told Officer Machula that he rented a gray 2019 Dodge Grand Caravan with Iowa license plate IVV652 from Enterprise, a car rental company, on February 25, 2020. Mr. Cooper said that he used the vehicle for two days and then lent it to a man known as "Pacman" on February 27, 2020. Mr. Cooper said that Pacman asked Mr. Cooper to use the vehicle. Mr. Cooper agreed to loan Pacman the vehicle and then Mr. Cooper gave Pacman the keys. Mr. Cooper said that on March 2, 2020, Pacman wired funds to Mr. Cooper's account to extend the rental arrangement. Mr. Cooper said that his rental agreement with Enterprise terminated on March 2, 2020. Mr. Cooper told Officer Machula that he attempted to contact Pacman via telephone multiple times, but Pacman's phone had been disconnected. After his attempts to contact Pacman, Mr. Cooper contacted Enterprise to report the situation. Enterprise directed Mr. Cooper to contact CRPD to report the vehicle as stolen. The vehicle was valued at $30,000. After Mr. Cooper reported the situation to Officer Machula, Officer Machula documented the report and entered the vehicle as stolen in the National Crime Information Center ("NCIC") computer system so officers could contact Enterprise if they discovered the vehicle.
>
> On March 21, 2020, Officer Michael Merritt reviewed the case, noticed that the stolen vehicle report remained active, and recognized the name Pacman as the street name of Defendant. Officer Merritt testified that he was familiar with the name, and its connection to Defendant, because Defendant was well known in the community and that Officer Merritt was familiar with prior police investigations involving Defendant. Officer Merritt knew that Defendant was wanted by local authorities to serve 15 days under a mittimus, although the local authorities adopted a

5

policy in the wake of the COVID-19 pandemic to not take custody of individuals wanted under a mittimus.

Officer Merritt drove to Defendant's last known registered address and saw a gray Dodge Grand Caravan matching the description of the stolen vehicle. Officer Merritt reported that the vehicle had Texas license plate LYB4189 attached to it, not an Iowa license plate, and also that the vehicle identification number ("VIN") matched the VIN of the stolen vehicle. Officer Merritt discovered that both the Texas and Iowa license plates were valid for the same vehicle, although the vehicle was reported stolen only under the Iowa license plate number. Officer Merritt attempted to call Enterprise, using two different phone numbers to verify the status of the vehicle but he was unable to reach a representative.

After he attempted to contact Enterprise, Officer Merritt noticed that the vehicle was no longer in the driveway. Concerned that he could no longer see the potentially stolen vehicle, Officer Merritt drove to find the vehicle, spotted it making a westbound turn, and then initiated a traffic stop. Officer Merritt testified that the basis for his stop was his belief that the vehicle was stolen. Officer Merritt informed the law enforcement dispatcher ("dispatch") that he would be performing a traffic stop on a potentially stolen vehicle. He provided dispatch the Texas license plate number. Officer Merritt stated that he did not perform a felony stop, but rather an ordinary traffic stop, on the vehicle due to the uncertainty surrounding the status of the Texas license plate and because Mr. Cooper admitted to lending the vehicle to another person. As he approached the vehicle, Officer Merritt noted that he smelled marijuana originating from inside the vehicle. Defendant, Olivia Evans, and their two daughters were in the vehicle. Officer Merritt informed them that he stopped their vehicle because it was reported stolen. Defendant told Officer Merritt that his uncle, Mr. Cooper, rented the vehicle and that Defendant was paying Mr. Cooper to use the vehicle. Defendant also admitted to Officer Merritt that he and Ms. Evans had smoked marijuana in the vehicle earlier that day. Officer Merritt informed Defendant that he would not take Defendant into custody at that moment, even though Defendant was meant to spend 15 days in jail under the mittimus.

Additional officers arrived on the scene and Officer Merritt informed them that he smelled marijuana in the vehicle and that he knew Defendant had a criminal history with firearms. Officer Merritt then ran the vehicle's VIN number, confirmed the vehicle was reported stolen, asked dispatch to

6

run the Texas license plate number, and confirmed that the Texas plate was registered to the same vehicle as the Iowa plate that was reported stolen. Officer Merritt was not personally aware of another case where license plates originating from two different states were valid and registered to a vehicle with the same VIN. Officer Merritt again called Enterprise, gave the phone to another officer to speak with a representative, and began conducting a search of the vehicle.

The officers discovered marijuana in the vehicle and a loaded teal Glock 43 with an obliterated serial number under Defendant's seat. During the officers' search of the vehicle, Officer Merritt conducted a pat down of Defendant to confirm whether Defendant had firearms on his person. Officer Merritt took Defendant into custody. Officer Merritt asked dispatch to confirm whether Defendant was issued a permit to carry weapons. Dispatch confirmed that Defendant was not issued a permit to carry weapons. Officer Merritt then requested that dispatch print a summary of Defendant's criminal history for the purpose of a firearms investigation. Both Defendant and Ms. Evans were transported to the police station for interviews.

Officer Merritt first interviewed Ms. Evans. Officer Merritt told Ms. Evans that she was not being charged, but that he wanted to speak with her about the events that day and the events leading up to the traffic stop. Officer Merritt read Ms. Evans her Miranda rights. Ms. Evans told Officer Merritt that she understood her rights and consented to speaking with Officer Merritt by signing the CRPD Waiver of Rights form. During her interview, Evans told Officer Merritt that she and Defendant took possession of the vehicle three weeks prior and that Defendant paid Mr. Cooper to use the vehicle. Ms. Evans said that the couple paid Mr. Cooper approximately $300 per week to use the vehicle. Ms. Evans claimed possession of a small bag of marijuana found in the vehicle and noted that she uses on occasion. She further denied seeing the firearm in the vehicle, seeing Defendant with the firearm, or ever handling the firearm.

Officer Merritt then interviewed Defendant. Officer Merritt read Defendant his Miranda rights. Defendant informed Officer Merritt that he understood his rights, but Defendant refused to sign the CRPD "Waiver of Rights" form. Defendant later told Officer Merritt that he arranged with Mr. Cooper weeks earlier to use the vehicle in exchange for regular payments of about $500 every 1.5 weeks. Defendant claimed that he did not know the vehicle was reported stolen and that Mr. Cooper did not

7

inform him that he had reported the vehicle stolen. Defendant again admitted to smoking marijuana in the vehicle earlier in the day and admitted that the marijuana found in the vehicle belonged to him. Defendant said that he smoked marijuana every day, most commonly multiple times per day. Defendant then claimed ownership of the firearm. He told Officer Merritt that he found the firearm in an alley some weeks previously. He noted that he carried the firearm from time to time for protection, and that he carried the firearm that day because he was with his family. Defendant said that he knew the gun was loaded. Defendant said that he did not conceal the firearm on his person when Officer Merritt approached the vehicle earlier, that he had placed the firearm under his seat when he was smoking marijuana earlier in the day, and that Ms. Evans did not know of, see, or touch the firearm. Defendant said that he had not noticed that the serial number on the firearm had been obliterated.

Following the interviews, Ms. Evans was released without charges and Defendant was booked into the Linn County Jail. At Enterprise's request, the vehicle was towed. The license plates were removed from it because Enterprise had no record of Texas plates belonging to the vehicle even though Officer Merritt confirmed that the NCIC system record showed that both the Iowa and Texas plates were registered to the same vehicle owned by Enterprise.

## IV. ANALYSIS

### A. *Motion to Suppress*

In his Motion to Suppress, defendant argued that the firearm and marijuana evidence must be suppressed because probable cause or reasonable suspicion to initiate a traffic stop did not exist. (Doc. 23-2, at 5–7). Defendant further argued that the statements he made during the traffic stop and subsequent custodial interview must be suppressed because they are "fruit of the poisonous tree," meaning they were obtained only through an antecedent violation of his constitutional rights. (*Id.*, at 7). The government countered that the traffic stop was supported by reasonable suspicion and probable cause and therefore there was no poisonous tree. (Doc. 25-1, at 1). The
8

government further argued that even if the stop was improper, the custodial interview was attenuated and should not be suppressed. (*Id.*).

In his R&R, Judge Roberts found that Officer Merritt had reasonable suspicion to perform the traffic stop and thus did not violate defendant's Fourth Amendment rights, legitimizing as evidence defendant's subsequent statements. (Doc. 33, at 10–16). Judge Roberts did not make a specific finding on whether probable cause also existed. (*Id.*). Judge Roberts found the stolen 2019 Dodge Grand Caravan, police report naming "Pacman" as a suspect, the officer's knowledge of defendant's alias as "Pacman" from his work in the community, the officer's observation of the vehicle in the driveway of the defendant's last known address on file with the Cedar Rapids Police Department, and the Texas plate's registration to the same VIN number as the Iowa plate all supported reasonable suspicion here. (*Id.*, at 12). Further, Judge Roberts alternatively found that, even if the traffic stop was indeed unconstitutional, defendant's statements during the traffic stop were not attenuated from the constitutional violation and must be suppressed as should the firearm and marijuana as fruits of the poisonous tree. (*Id.*, at 15–16, 21). Judge Roberts also alternatively found that, if the traffic stop was unconstitutional, defendant's statements made during his custodial interview at the police station should not be suppressed because they were sufficiently attenuated from the constitutional violation. (*Id.*, at 22).

### B. Objections to R&R

Defendant objects to two of Judge Roberts' legal conclusions. (Doc. 38, at 1). First, defendant objects to the conclusion that the traffic stop did not violate his Fourth Amendment rights, arguing Officer Merritt did not have probable cause or reasonable suspicion to stop the vehicle and alternatively that any mistake of law in stopping the vehicle was objectively unreasonable. (*Id.*) Second, defendant objects to Judge Roberts' alternative conclusion that even if the traffic stop was unconstitutional, the doctrine of

9

attenuation applies to defendant's statements made during his custodial interview. (*Id.*) The Court will address each objection in turn.

### 1. *Traffic Stop*

Judge Roberts found in his R&R that Officer Merritt had reasonable suspicion sufficient to perform the traffic stop, summarizing the officer's knowledge at the time of the stop as including the stolen 2019 Dodge Grand Caravan, police report naming "Pacman" as a suspect, the officer's knowledge of defendant's alias as "Pacman," the officer's observation of the vehicle in the driveway of the defendant's last known address, and the Texas plate's registration to the same VIN number as the Iowa plate. (Doc. 33, at 12). Judge Roberts further found that, assuming Officer Merritt initiated the stop under an incorrect belief that the vehicle was stolen, this mistake was objectively reasonable and "still justif[ied] a valid stop." (*Id.*, at 14–15) (quoting *United States v. Williams*, 929 F.3d 539, 544 (8th Cir. 2019)). Defendant objects to these conclusions, arguing that the facts at issue here do not constitute a theft under Iowa Code Section 714.1. (Doc. 38-1, at 7–8). Rather, defendant argues Mr. Cooper voluntarily loaned him the vehicle. (Doc. 38-1, at 7-8).

A traffic stop constitutes a seizure for purposes of the Fourth Amendment, and therefore must be supported by probable cause or reasonable suspicion. *United States v. Hollins*, 685 F.3d 703, 705–06 (8th Cir. 2012). Probable cause is present when "there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Shackleford*, 830 F.3d 751, 753 (8th Cir. 2016) (cleaned up). "[T]he probable cause standard is a practical, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent [people], not legal technicians, act." *Maryland v. Pringle*, 540 U.S. 366, 370 (2003) (internal citations and quotations omitted). In other words, "[a] police officer has probable cause . . . when the facts available to him would warrant a person of reasonable

10

caution in the belief that contraband or evidence of a crime is present." *Florida v. Harris*, 568 U.S. 237, 243 (2012) (cleaned up). Probable cause "does not require evidence sufficient to support a conviction, nor even evidence demonstrating that it is more likely than not that the suspect committed a crime." *United States v. Donnelly*, 475 F.3d 946, 954 (8th Cir. 2007) (cleaned up). "[T]he mere probability or substantial chance of criminal activity, rather than an actual showing of criminal activity, is all that is required." *United States v. Winarseke*, 715 F.3d 1063, 1067 (8th Cir. 2013) (internal citation and quotations omitted). Further, an "officer has reasonable suspicion when the officer is aware of particularized, objective facts which, taken together with rational inferences from those facts, reasonably warrant suspicion that a crime is being committed." *Hollins*, 685 F.3d at 705 (citation and internal quotation marks omitted).

The Court agrees with Judge Roberts that "[w]hether [d]efendant could ultimately be convicted of a theft or possession of the vehicle is not the point of . . . this analysis," (Doc. 33, at 12), and thus will not recapitulate the analysis of the Iowa Code here that Judge Roberts has already thoroughly discussed in his R&R. The Court further agrees with Judge Roberts' conclusion that Officer Merritt had reasonable suspicion sufficient to justify a traffic stop. The Court also modifies his conclusion, however, and finds that probable cause also supported the stop based on the same facts.

> The record indicates that before Officer Merritt conducted the traffic stop he was aware that (1) a 2019 gray Dodge Grand Caravan with Iowa license plates was reported stolen by the bailee at the insistence of the vehicle's owner, (2) a man called "Pacman" was in possession of the stolen vehicle, (3) "Pacman" was the commonly known alias of Defendant, (3) Defendant had prior criminal history, including criminal history with firearms, (4) CRPD had a record of Defendant's last known address, (5) a gray Dodge Grand Caravan matching the description of the stolen vehicle sat in Defendant's driveway at that last known address, (6) the Texas license plate attached to the vehicle in Defendant's driveway was registered to the same VIN as the Iowa license plate that was reported stolen, and

11

> (7) that the vehicle was no longer sitting in the driveway when Officer Merritt returned after attempting to contact Enterprise.

(Doc. 33, at 12). Considering all these particularized, objective facts available to Officer Merritt at the time of the traffic stop, the Court finds that his reasonable suspicion that a theft had occurred was warranted. *See Hollins*, 685 F.3d at 705. The Court also finds that "a person of reasonable caution" could conclude "that contraband or evidence of a crime [wa]s present." *Harris*, 568 U.S. at 243; *see also United States v. Pappas*, 452 F.3d 767, 771 (8th Cir. 2006) (finding that an officer had probable cause to initiate a traffic stop based on her history with the defendant, observation of the defendant driving, and review of a computer record indicating the defendant's license was suspended).

This is true even assuming Officer Merritt was mistaken in his belief that the van was stolen because that mistake is objectively reasonable considering the information he had at the time of the stop. "[I]n mistake cases the question is simply whether the mistake, whether of law or of fact, was an objectively reasonable one." *United States v. Smart*, 393 F.3d 767, 770 (8th Cir. 2005). This calculation "is not to be made with the vision of hindsight, but instead by looking to what the officer reasonably knew at the time." *Id.* (internal quotation marks omitted). Importantly, "an officer can gain no Fourth Amendment advantage through a sloppy study of the laws he is duty-bound to enforce," *Heien v. North Carolina*, 574 U.S. 54, 67 (2014), and thus the "Fourth Amendment tolerates only [objectively] *reasonable* mistakes." *Id.* at 66. Again, based on the facts known to Officer Merritt at the time of the traffic stop including the stolen vehicle report filed at the request of Enterprise and the unique situation with two license plates registered to the same VIN, he could objectively reasonably believe, even mistakenly, that the van was stolen, thus warranting a traffic stop. *See also Williams*, 929 F.3d at 544 (finding that an officer's mistaken reading of a stolen car report was

12

objectively reasonable based on the totality of the circumstances and warranted the stop at issue).

Thus, the Court overrules defendant's objections and adopts Judge Roberts' R&R in finding that Officer Merritt's traffic stop did not violate defendant's constitutional rights. The Court modifies Judge Roberts' R&R in finding that the stop was supported both by reasonable suspicion and probable cause. The Court further finds there was no poisonous tree tainting the other evidence at issue.

### 2. *Statements Made During Custodial Interview*

Judge Roberts alternatively found that even if the traffic stop was unconstitutional, defendant's statements made during the interview at the police station were sufficiently attenuated from the traffic stop to be admitted as evidence. Judge Roberts weighed four factors in determining whether the attenuation doctrine applied here: (1) whether *Miranda* warnings were given, (2) the "temporal proximity" between the constitutional violation and the statements, (3) intervening circumstances, and (4) the "'purpose and flagrancy of the official misconduct.'" (Doc. 33, at 18); *see also United States v. Riesselman*, 646 F.3d 1072, 1080 (8th Cir. 2011). Finding that defendant was *Mirandized*, approximately two hours had passed since the original traffic stop, the location had changed from the traffic stop to the police station, and there was no flagrant behavior or official misconduct, Judge Roberts found the attenuation doctrine applied. (Doc. 33, at 21–22). Defendant objects, arguing that although he was *Mirandized*, he refused to sign the Waiver of Rights form. (Doc. 38-1, 12). Defendant further notes that he was in custody the entire two-hour time between the traffic stop and the police interview and his interview was conducted by the same police officer who stopped and arrested him, arguing that these facts weigh against finding that the attenuation doctrine applies. (*Id.*, at 13).

The evidentiary exclusionary rule is the "principal judicial remedy to deter" law enforcement officers from violating the Fourth Amendment. *Utah v. Strieff*, 136 S.Ct.

13

2056, 2061 (2016). Enforcing the guarantees of the Fourth Amendment through application of the exclusionary rules, however, comes with "substantial social costs." *United States v. Leon*, 468 U.S. 897, 907 (1984). Thus, the exclusionary rule must only be applied when "its deterrence benefits outweigh its substantial social costs." *Hudson v. Michigan*, 547 U.S. 586, 591 (2006) (internal quotation marks omitted). One circumstance in which "the interest protected by the constitutional guarantee that has been violated would not be served by suppression of the evidence obtained," *Id.*, at 593, is "when the connection between the unconstitutional police conduct and the evidence is remote or has been interrupted by some intervening circumstance." *Strieff*, 136 S.Ct. at 2061. "The attenuation doctrine evaluates the causal link between the government's unlawful act and the discovery of evidence[.]" *Id.* In considering whether statements made as a result of illegal police conduct should be suppressed as tainted, courts consider the four factors Judge Roberts aptly detailed and weighed in his R&R. "No single factor is dispositive." *Brown v. Illinois*, 422 U.S. 590, 603 (1975).

Applying the attenuation factors here, the Court finds that the statements made by defendant at the police station were sufficiently attenuated to cure the taint of any constitutional violations that may have occurred. First, Officer Merritt informed defendant of his rights under *Miranda v. Arizona*, 384 U.S. 436 (1966), prior to questioning at the police station. Nothing in the record indicates that defendant was noticeably impaired, and he was able to communicate intelligently and effectively. Defendant acknowledged his *Miranda* rights and elected to speak to the officer anyway. Defendant asserts that his "refusal to sign the form indicates at least some reluctance to speak with Officer Merritt." (Doc. 38-1, at 12). Although that may be true, defendant still spoke with Officer Merritt after being *Mirandized*. Further, there is nothing in the record to indicate that this waiver of defendant's rights under *Miranda* were not "made voluntarily, knowingly[,] and intelligently." *See Miranda*, 384 U.S. at 444. Finally, it

14

is well-settled that the mere absence of a written waiver is not by itself dispositive of whether a waiver is valid. *See Berghuis v. Thompkins*, 560 U.S. 370, 382 (2010) (holding defendant waived his right to remain silent absent a written waiver because he made no contention that he did not understand his rights and thus "knew what he gave up when he spoke" after being *Mirandized*); *North Carolina v. Butler*, 441 U.S. 369, 375–76 (1979) (holding that "an explicit statement of waiver is not invariably necessary to support a finding that the defendant waived the right to remain silent or the right to counsel"); *United States v. Magallon,* 984 F.3d 1263, 1284–85 (8th Cir. 2021) (finding valid waiver of *Miranda* rights absent written waiver through analysis of the totality of the circumstances). This factor weighs strongly against suppression even assuming defendant was reluctant to waive his rights in writing.

Second, defendant's custodial interview occurred two hours after the alleged constitutional violation. Given the fact that defendant was in custody for that entire time, this relatively short period of time offers minimal attenuation. *Contrast Rawlings v. Kentucky*, 448 U.S. 98, 107–08 (1980) (finding 45 minutes "under the strictest of custodial conditions" between violation and interview to weigh in favor of suppression), *with United States v. Yorgensen*, 845 F.3d 908, 914 (8th Cir. 2017) (finding a period of two days between violation and interview weighs against suppression). The Court must, however, balance the interval of time between the alleged violation and the statements in question against "the precise conditions under which" defendant was detained. *See Rawlings*, 448 U.S. at 107. The relatively short period of time that elapsed in *Rawlings* was entirely mitigated by the fact that the defendant there was detained in his home, moved freely around the first floor of the house, made himself coffee, played with his dog, and enjoyed a generally congenial dialogue with the officers present. *Id.*, at 107–08. Here, defendant was restrained in handcuffs, confined in the back of a police vehicle, and taken to a police interview room at the police station where his handcuffs were then

15

removed. (Doc. 36, at 35–36). Although arguably not the "strictest of custodial conditions" as envisioned by the Supreme Court in *Rawlings*, the conditions faced by defendant here were significantly more restrictive than the casual circumstances which outweighed the "relatively short" span of 45 minutes in *Rawlings*. Further, the difference in time between the initial traffic stop and the custodial interview is relatively short, particularly because the conditions of defendant's detention remained largely unchanged. In light of these conditions and the short span of time between the violation, this factor weighs slightly in favor of suppression. The Court sustains defendant's objection on this issue and modifies Judge Roberts' R&R accordingly.

Third, several intervening circumstances may be relevant here. It is significant when the questioning officer is from a separate agency "and neither agent nor agency had any involvement with the initial Fourth Amendment violation." *Yorgensen*, 845 F.3d at 914. Here, the officer who questioned defendant at the station was also the officer who arrested and questioned him at the scene. A change of location can also be a significant intervening circumstance. *Riesselman*, 646 F.3d at 1080. The custodial interview occurred after a change of location, here, from the scene of the stop to the police station and defendant's handcuffs were removed. There are elements in this factor weighing both for and against suppression, but on the whole, the Court finds that this factor weighs slightly against suppression given the change in location and easing of custodial restrictions.

Finally, as to the purpose and flagrancy of official misconduct, the Court finds this factor weighs strongly against suppression here. Nothing in the record indicates that Officer Merritt behaved in any way that could be considered misconduct. Assuming that any part of Officer Merritt's stop was misconduct at all, it "does not rise to the level of conscious or flagrant misconduct requiring prophylactic exclusion of" defendant's statements. *See Rawlings*, 448 U.S. at 110.

16

With three factors weighing against suppression and one factor weighing slightly for suppression, the Court finds that there was sufficient attenuation between the traffic stop and the subsequent interview to allow for admission of defendant's statements. Thus, the Court sustains in part and overrules in part defendant's objections on this issue and adopts Judge Roberts' R&R with minor modification.

## V. CONCLUSION

For these reasons, defendant's objections (Doc. 38) are **sustained in part and overruled in part,** the R&R (Doc. 33) is **adopted** with minor modifications, and defendant's Motion to Suppress (Doc. 23) is **denied**.

**IT IS SO ORDERED** this 4th day of August, 2021.

_____
C.J. Williams
United States District Judge
Northern District of Iowa